J-S60030-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: B.L.F., A MINOR CHILD | : | IN THE SUPERIOR COURT OF |
| APPEAL OF B.M.F. | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 735 WDA 2017 |

Appeal from the Order Entered May 17, 2017
In the Court of Common Pleas of Blair County
Civil Division at No(s): CP-7-DP-00022-2017

BEFORE: OLSON, J., DUBOW, J., and STEVENS, P.J.E.*

MEMORANDUM BY DUBOW, J.: FILED OCTOBER 20, 2017

Appellant, B.M.F. ("Father"), appeals from the May 17, 2017 Order which adjudicated his infant child, B.J.F. ("Child"), dependent and placed Child in foster care. After careful review, we conclude that the trial court heard sufficient evidence to adjudicate Child dependent but failed to establish a clear necessity for placement of Child outside of Father's home. We, therefore, affirm in part and vacate in part.

L.J. ("Mother") gave birth to Child in February 2017. At that time, Mother was married to A.J., rendering A.J the legally presumptive father of Child.[1] Shortly after Child's birth, on February 22, 2017, at the request of Blair County Children, Youth, and Families ("Agency"), the trial court issued an Emergency Protective Custody Order and placed Child in foster care due to

_____

[1] Mother and A.J. subsequently divorced in April 2017.

_____
* Former Justice specially assigned to the Superior Court.

Mother's extensive history with the Agency and safety concerns if Mother were to leave hospital with Child. On February 24, 2017, the trial court held a shelter care hearing, ordered Child to remain in foster care, and scheduled an adjudicatory hearing for March 2, 2017.

On March 2, 2017, the trial court continued the adjudicatory hearing pending the results of paternity testing, which ultimately determined that Father was the biological parent of Child.

On May 11, 2017, the trial court held an adjudicatory hearing. At the request of the Agency, and over Father's objection, the trial court took judicial notice of the record of previous dependency and involuntary termination of parental rights proceedings regarding Mother's older children, including findings of aggravated circumstances.[2]

Initially, the Agency presented evidence regarding Mother. Mother stipulated that if called to testify, the Agency's witnesses would testify consistent with the allegations in the February 24, 2017 Dependency Petition, which we incorporate herein. In sum, Mother's four older children have either been placed in foster care or adopted. Mother has a history of substance

_____

[2] The Agency presented evidence that the courts had made a finding of aggravated circumstances against Mother on December 20, 2011 for aggravated physical neglect, on June 18, 2012 for failure to maintain substantial and continuing contact, and on August 2, 2016 for a prior involuntary termination of parental rights. The trial court involuntarily terminated Mother's parental rights to two of her children by Orders entered June 12, 2012, and February 14, 2017.

abuse, domestic violence, untreated mental health issues, and unstable housing. Mother has been generally non-compliant with services offered by the Agency. Most recently, the Agency received information that Mother was drinking alcohol while pregnant with Child and that she was not receiving pre-natal care.

The Agency next presented evidence regarding Father. Adoption Caseworker Rachel Steinbugl testified that Father resides in an appropriate home with his parents, Paternal Grandfather and Paternal Grandmother. Father maintains full-time employment and works the night shift. Ms. Steinbugl testified that Father does not have a criminal record and does not have problems with drugs or alcohol. The Agency's primary concern with Father having physical custody of Child is that Father would allow Mother to have unsupervised contact with Mother.

The Agency presented testimony from Jenny Walter, a Path Program Supervisor, who supervises Father's visitation with Child twice a week. Ms. Walter testified that Father does well during the visits and that Father only missed one out of fourteen visits due to illness.

The Agency presented testimony from Paternal Grandfather, who stated that Father works from 6:00 P.M. to 6:00 A.M., which alternates between three days one week and four days the next week. Paternal Grandfather is available to care for Child while Father is at work. Paternal Grandmother works a full-time job, but is available on nights and weekends to assist in caring for Child while Father is at work. Paternal Grandfather would not allow

Mother to have unsupervised contact with Child, and expressed concerns that an ongoing relationship between Mother and Father would not be in Child's best interests.

Paternal Grandfather admitted that he had a criminal history from twenty years ago; he has a misdemeanor simple assault conviction from 1997 and a theft conviction from 1998. Paternal Grandfather received inpatient alcohol treatment in 2008, and has not had a problem with alcohol since then. Paternal Grandmother does not have a criminal history.

Finally, the Agency called Mother as an adverse witness to testify about her current relationship with Father. Mother denied being in a romantic relationship with Father. The Agency showed Mother Exhibit 3, which consisted of six printed pages off the Facebook website showing, in pertinent part: pictures of Mother, pictures of Mother and Father together, and messages conveying affection towards Father. Mother acknowledged that at least some of the Facebook posts in Exhibit 3 were her posts. When asked about posts regarding Father, Mother claimed her Facebook page had been hacked.

Father testified on his own behalf, and stated that he wanted Child to live with him. Father purchased a crib and some clothes for the baby, and stated he was going to buy more things in the next few days. Father confirmed that he has the Paternal Grandparents' support in caring for Child. Father testified that he has some experience caring for babies because he babysat

his best friend's daughter several times a week for the first year of the child's life.

Father testified regarding his employment history. Father served in the United States military from 2005 until 2011, when he was honorably discharged. Father then worked in construction, and he is currently employed full time at a company named Cenveo.

Father testified about his relationship with Mother and stated that they are not currently romantically involved. Father began dating Mother around February 2016 and in March or April of 2016, they moved in together. After two months, the couple broke up after Mother told Father to move out without explanation. Mother and Father did not have any contact until November 2016 when Mother told Father she was pregnant. At that time, Mother and Father discussed possibly rekindling their relationship and moving back in together, but Father wanted to wait and get a paternity test. Prior to Child's birth, Father changed his mind about moving in with Mother and "thought it would have been better off that we each get our own place and discuss the whole custody thing." N.T. Adjudicatory Hearing, 5/11/17, at 77.

Father testified that he was not aware of Mother's prior involvement with the Agency until the Child was born and the Agency came to the hospital. If Child lives with Father, Father believes that Mother should have scheduled supervised visitation with Child. Father prefers that the visits are supervised by him and another party simultaneously "[j]ust so I have a witness just in case anything happens there's another person involved so I'm not the only

person with the eyes that seen what went on and that occurred at that moment and time." Id. at 69.

Father testified that since Child's birth, he has become closer friends with Mother. Father testified that he sees Mother one or two days a week and stated, "We mainly been hanging out a lot lately due to the fact that we're trying to figure this whole situation out together as friends." Id. at 78. Father stated that he does not anticipate becoming romantically involved with Mother in the future.

Father testified that he deactivated his Facebook account over a year ago. When the Agency showed Father Exhibit 3, which included pictures of Father and Mother on Mother's Facebook page, Father stated that he had not previously seen the Facebook posts.

At the conclusion of the hearing, the trial court adjudicated Child dependent, granted the Agency legal custody of Child, and ordered Child to remain in foster care. The trial court ordered the permanency goal to be reunification with Father, with a concurrent goal of adoption, and ordered the Agency to implement appropriate reunification services.[3] Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issues on appeal:

_____

[3] The trial court made a finding of Aggravated Circumstances against Mother and ordered that the Agency did not have to make reasonable efforts to reunify Child with Mother.

1. Whether the admission of testimony from other proceedings was proper, where the Father was not a party to those proceedings?

2. Whether evidence that [] Father maintained a relationship with [] Mother, who had neglected her other children, is sufficient to support an adjudication of dependency?

3. Whether a clear necessity for placement of [Child] was established?

Father's Brief at 10 (reordered for ease of disposition).

The Pennsylvania Superior Court has set forth our standard of review for dependency cases as follows:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

To adjudicate a child dependent, a trial court must determine by clear and convincing evidence that the child, inter alia, "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." In re A.B., 63 A.3d 345, 349 (Pa. Super. 2013) (citing 42 Pa.C.S. § 6302). Further, "[a] determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]" 42 Pa.C.S. § 6302. Clear and convincing evidence is defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts

to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." In re A.B., supra at 349 (citation and quotation omitted).

The overarching purpose of the Juvenile Act is to preserve the unity of the family whenever possible. Id. (citing 42 Pa.C.S. § 6301(b)(1)). Accordingly, "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available." In Interest of R.T., 592 A.2d 55, 57 (Pa. Super. 1991). This Court has defined "proper parental care" as care which is "geared to the particularized needs of the child and [] at a minimum, is likely to prevent serious injury to the child." In re A.B., supra at 349. Further, "when determining whether a parent is providing a minor with proper care and control, we believe that the caretaker's acts and omissions should weigh equally. The parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm that others may inflict." In re A.H., 763 A.2d 873, 876 (Pa. Super. 2000) (internal citations and quotation marks omitted). Finally, our Supreme Court has held unequivocally that "where a non-custodial parent is ready, willing[,] and able to provide adequate care to a child, a court may not adjudge that child dependent." In re M.L., 757 A.2d 849, 851 (Pa. 2000).

Once a child is found to be a dependent child, the trial court may enter a disposition "best suited to the safety, protection and physical, mental, and moral welfare of the child[,]" including, inter alia, permitting the child to

remain with his parent subject to supervision as directed by the court or transferring temporary legal custody of the child to an agency. 42 Pa.C.S. § 6351(a). However, a trial court may not separate that child from his or her parent unless it finds that the separation is clearly necessary. In re G.T., 845 A.2d 870, 873 (Pa. Super. 2004). "Such necessity is implicated where the welfare of the child demands that he or she be taken from his or her parents' custody." Id. (citation and quotation omitted). Further, clear necessity for removal is not shown until the trial court determines that alternative services that would enable the child to remain with his or her family are unfeasible. In Interest of K.B., 419 A.2d 508, 515 (Pa. Super. 1980).

In his first issue on appeal, Father avers that the trial court erred when it incorporated into the record the testimony from several previous dependency and termination proceedings involving Mother's other children. Father's Brief at 26. Father argues that testimony from other proceedings is hearsay pursuant to Pa.R.E. 801(c) and does not qualify for the Pa.R.E. 804(b)(1) former testimony exception to the hearsay rule. Id.

It is well settled that "[a] party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made." Commonwealth v. Lopez, 57 A.3d 74, 81 (Pa. Super. 2012) (citation omitted). If counsel states the specific grounds for an objection, then all other unspecified grounds are waived and cannot be raised for the first time on appeal. Id.

During the adjudicatory hearing, the trial court took "judicial notice of the prior dependency proceedings [regarding A.J. III and I.H.]" and "judicial notice of involuntary TPR proceedings [regarding A.J. III and I.H.]" N.T. Adjudicatory Hearing, 5/11/17, at 8. Father's counsel made an objection to the admission of any testimony or stipulations from those proceedings based on relevancy, stating: "A bunch of it I think is not relevant given the mother's position that she doesn't seek to be a resource for the child." Id. at 7. Now on appeal, Father avers that the testimony from prior proceedings was improperly admitted into evidence because it constitutes hearsay. Father did not raise this specific objection during the adjudicatory hearing, and, thus, we deem this issue to be waived. See Lopez, supra at 81.

In his next issue on appeal, Father avers that he is ready, willing, and able to care for Child, and that evidence that Father maintained a relationship with Mother, who had neglected her other children, is not sufficient to support an adjudication of dependency. Father's Brief at 19, 24. Father argues that having a relationship with Mother does not, in itself, place Child at risk and to establish dependency, there must be evidence that the relationship actually places Child at risk. Id. at 21.

In its 1925(a) Opinion, the trial court concluded: "the evidence deduced during our Adjudicatory/Dispositional Hearing held May 11, 2017 firmly established that there is an ongoing relationship between the parents of [Child], which is the primary source of concern to this [c]ourt as it relates

to [] Father." Trial Court Opinion, dated 6/6/17, at 5 (emphasis in original). The trial court acknowledged that Father did not have any criminal or Agency history, but expressed concerns about Father's relationship with Mother because Mother "poses a direct safety risk" to Child. Id. at 13 (emphasis in original). The trial court cites In re R.W.J., 826 A.2d 10, 15 (Pa. Super. 2003), to support its conclusion that prognostic evidence is sufficient to declare a child dependent, and opines that Father's relationship with Mother is prognostic evidence of a safety risk to Child.

A review of the record supports the trial court's conclusion. While Father may be ready and willing to care for Child, his relationship with Mother indicates that he is not presently able to ensure Child's safety. To adjudicate Child dependent, the Agency had to present clear and convincing evidence that Father engaged in "conduct . . . that places the health, safety or welfare of the child at risk[.]" 42 Pa.C.S. § 6302. The trial court made a finding that Mother and Father's testimony regarding their platonic relationship was not credible, and "the parents have a more involved and continuing relationship than either parent acknowledged or admitted at the time of hearing." Order, 5/16/17. Father's ongoing relationship with Mother, who the trial court concluded presented a "direct safety risk" to Child, is clear and convincing evidence of conduct that places the safety of Child at risk. Accordingly, we find no abuse of discretion in the trial court's adjudicating Child dependent.

In his final issue on appeal, Father avers that the Agency failed to establish that there was a clear necessity to place Child in foster care and the trial court erred when it entered that disposition. Father's Brief at 29. Father argues that any concern about Mother having unsupervised contact with Child could be alleviated by a court order prohibiting such contact between Mother and Child and implementing appropriate services in Father's home. Id. at 29-30.

As stated above, a trial court may not separate a child from his or her parent unless it finds that the separation is clearly necessary to ensure the child's safety and welfare. In re G.T., supra at 873. In order to make a finding that separation is clearly necessary, a trial court must first determine that alternative services enabling the child to remain with his or her family are unfeasible. In Interest of K.B., supra at 515. We recognize, "it is not for this Court, but for the trial court as fact finder, to determine whether a child's removal from his/her family was clearly necessary." A.N. v. A.N., 39 A.3d 326, 334 (Pa. Super. 2012) (citation and quotation omitted).

During the adjudicatory hearing, Father and Paternal Grandfather both testified that they were willing to accept services into the home and that they agreed Mother should have only supervised visitation with Child. The Agency testified that it was possible to make a referral for "preservation services" if the trial court ordered Child to live with Father and "reunification services" if

the trial court ordered Child to remain in foster care. N.T. Adjudicatory Hearing, 5/11/17, at 23-24.

In its Order of Adjudication and Disposition, the trial court made the following finding regarding the clear necessity for Child's placement in foster care: "Child's placement is the least restrictive placement that meets the needs of [Child] and there is no less restrictive alternative available, in that [Child] is with his half-sibling in a family setting with foster parents who are the adoptive resource for his sibling, and are willing to be the adoptive resource for [Child] if reunification efforts are not successful." Order, 5/16/17, at 4. This finding simply describes where Child was placed. The court was required, however, to make a finding regarding whether the implementation of alternative services would allow Child to remain with Father. See In Interest of K.B., supra at 515.

It is not for this Court, but for the trial court as fact finder, to determine whether alternative services enabling Child to live with Father are feasible, and consequently whether placement in foster care is clearly necessary. See A.N. v. A.N., supra at 334. Because the trial court did not determine whether alternative services enabling the child to remain with Father were feasible, the court did not establish that separation from Father was clearly necessary to ensure the child's safety and welfare. Accordingly, we are constrained to vacate the dispositional portion of the trial court's Order and remand this case for a hearing to enable the trial court to make findings regarding: (1) whether

implementation of alternative services enabling Child to remain with his Father is feasible, and (2) whether there is a clear necessity to place Child in foster care.

We instruct the trial court to consider the totality of the evidence when making these findings, including evidence presented by the Agency that Father had appropriate housing, had full-time employment, had experience with caring for a child, had no criminal history, had no history with the Agency, and consistently attended visitation where he interacted appropriately with Child.

Order affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

President Judge Emeritus Stevens joins the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/20/2017