J-S09045-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3235 EDA 2024 |

Appeal from the Order Entered November 20, 2024
In the Court of Common Pleas of Bucks County Civil Division at No(s):
CP-09-DP-0000150-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: T.W., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3236 EDA 2024 |

Appeal from the Order Entered November 21, 2024
In the Court of Common Pleas of Bucks County Civil Division at No(s):
CP-09-DP-0000151-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: E.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3237 EDA 2024 |

Appeal from the Order Entered November 21, 2024
In the Court of Common Pleas of Bucks County Civil Division at No(s):
CP-09-DP-0000152-2022

BEFORE:   LAZARUS, P.J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED APRIL 8, 2025**

D.V. ("Mother") appeals from the order issued by the Court of Common Pleas of Bucks County, which adjudicated dependent her three children: H.W. (born December 2015), T.W., Jr. (born January 2019), and E.V. (born November 2020).[1]  After careful review, we affirm.

The Bucks County Children and Youth Social Services Agency ("CYS or the Agency") had been previously involved with this family as it had obtained emergency protective custody of the Children in November 2022 due to concerns of Mother's substance abuse and the incarceration of the Children's father, T.W. ("Father").  Dependency Petition, 10/30/24, at 3.  On November 10, 2022, the trial court entered a shelter care order placing the Children in kinship care with Maternal Grandparents.  Thereafter, the trial court vacated the shelter care order in April 2023 and confirmed that the sole physical and legal custody of the Children would be placed with Father, who had since been released from prison.

On October 30, 2024, CYS filed dependency petitions for each of the Children.  At that point, Mother had not had custody of the Children for two years.  The trial court held a dependency hearing on November 6, 2024 at which Father failed to appear.  The trial court noted that Mother was present but appeared to be in "an agitated state throughout the hearing."  Trial Court

_____

[*] Former Justice specially assigned to the Superior Court.
[1] The Children's father, T.W. ("Father") has not appealed the adjudication.

- 2 -

J-S09045-25

Opinion (T.C.O.), 1/2/25, at 2. The trial court summarized the factual background of the cases as follows:

> The testimony at the hearing reflected the Agency's efforts to assist the family and chronicled various attempts to identify stable and appropriate housing for the Children after Father lost the housing he had at the Robert Morris Apartments in Morrisville, Pennsylvania. Father and the Children stayed at a shelter for a period of time[.][2,3] [Thereafter,] Father made arrangements for the Children to stay with Paternal Uncle, in Coopersburg, Pennsylvania, which is over an hour away from where they had been living. After the Children left the shelter, they stopped attending school.
>
> The Agency attempted to communicate with Mother, but aside from a few phone calls and texts in September of 2024, Mother was generally non-responsive and non-cooperative. During one of the September calls, the Agency spoke with Mother about reported concerns regarding her ability to safely care for the Children, including offering support through drug and alcohol services, to which Mother responded stating that she did not have an issue and was not in need of a drug and alcohol assessment. Mother then stopped responding to repeated Agency outreach and attempts to meet in person between October 8 and October 20, 2024. When Mother ultimately did respond, it was merely to leave a voicemail message saying that she was not responding to the Agency's outreach because she was upset. After receiving Mother's voicemail, the Agency reached out to Mother again, but Mother never returned the Agency's call.

_____

[2] Between March 2024 and September 2024, CYS received six referrals reporting "concerns of Father's unstable housing, substance abuse, selling food stamps, leaving the Children unattended while living at a homeless shelter and the Children not having food and being dirty and unkempt." Findings of Fact, 11/13/24, at 1.

[3] Further, CYS received a referral that Father and the Children would be removed from a Supportive Housing Program (SHP) as of September 20, 2024 as Father did not follow the program policy, was "engaging in disorderly conduct, drinking while on the property, and bringing guests onto the property after curfew." Findings of Fact, 11/13/24, at 1.

- 3 -

In the midst of Mother being non-responsive, on October 18, 2024, Father signed a Voluntary Placement Agreement, placing the Children with Maternal Grandparents, who are approved foster parents and needed funding support from the Agency.[4]  The Children had lived with Maternal Grandmother in foster care previously.  Maternal Grandmother got the Children back in school and signed them up for activities such as karate, dance, and scouts.

Father has been largely missing since the Children went to Paternal Uncle's and then Maternal Grandmother's. …

While [Mother] indicated in mid-to-late September that she was living with the Children's Maternal Great-Grandmother, at least by October 15, 2024, she was not staying there.  Mother testified that she thought Maternal [Great-]Grandmother would be okay with the Children living there[.] …

Mother last had custody of the Children approximately two (2) years ago.  Mother acknowledged that Maternal Grandmother is taking good care of the Children.

While Mother has visited the Children at Maternal Grandmother's home, Maternal Grandmother does not allow Mother to be alone with the Children unsupervised.  Maternal Grandmother testified … that Mother has significant mood swings and outbursts, often seeming to be "high" while at the Maternal Grandmother's house where the Children have been residing.  Approximately two (2) weeks before the hearing, family members found Mother unresponsive and not moving, resulting in an ambulance being called, and Mother being hospitalized overnight.

Mother acknowledged to Maternal Grandmother the need to get into treatment and mental health therapy but has not followed through.  From Maternal Grandmother's [] observations, Mother is unable to take care of the Children's needs and would require treatment, therapy, and mental health counseling to able to care for the Children.

T.C.O. at 2-5 (citations omitted).

---

[4] Before Father signed the voluntary placement agreement, CYS offered Father housing assistance.  When Father was notified that such housing assistance was contingent on Father continuing with the agency's involvement, Father declined these services.  Notes of Testimony (N.T.), 11/16/24, at 7-9.

At the conclusion of the hearing, the trial court entered an order with findings of fact on November 14, 2024, adjudicating the Children dependent, granting physical and legal custody to CYS, and placing the Children in kinship foster care with Maternal Grandparents.[5]  Mother filed a timely appeal.

Mother raises the following issues for our review on appeal:

1. Did the trial court abuse its discretion and/or err as a matter of law by finding that the Agency met its burden of clear and convincing evidence that the [C]hildren were dependent pursuant to 42 Pa.C.S. § 6302, definition (1) of "dependent child"[?]

2. Did the trial court abuse its discretion and/or err as a matter of law by finding that the Agency made reasonable efforts to prevent or eliminate the need for removal of the Child[ren] from the home[?]

Mother's Brief, at 5.

The standard of review in dependency cases requires this Court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record; but it does not require this Court to accept the trial court's inferences or conclusions of law.  *Interest of I.R.-R.*, 208 A.3d 514, 519 (Pa.Super. 2019) (citing *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (2010)).  As such, we review for an abuse of discretion.  *Id.*

---

[5] The trial court docket contains an indication that the parties were not served with the trial court's order in 3235 EDA 2024 until November 20, 2024 and the trial court's orders in 3236-37 EDA 2024 until November 21, 2024.  Our rules of appellate procedure provide that "[t]he date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given."  Pa.R.A.P. 108.  We have amended the caption of these appeals accordingly.

Mother first challenges the trial court's determination that the Agency proved the Children were "dependent." To adjudicate a child dependent, the court must determine, by clear and convincing evidence, that the child:

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.

42 Pa.C.S.A. § 6302(1). "Clear and convincing evidence" is defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Interest of L.V.*, 209 A.3d 399, 416 (Pa.Super. 2019) (citations omitted).

> In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," *see* 42 Pa.C.S.A. § 6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available." This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child."

*Id.* (internal citations and citation omitted).

"The Juvenile Act authorizes state agencies and the courts to ensure that parents meet certain legislatively determined irreducible minimum standards in executing their parental rights." *In re R.W.J.*, 826 A.2d 10, 14 (Pa.Super. 2003) (citation omitted). A compelling consideration in a dependency finding is the "ability and willingness of the parent or parents to

provide necessary and proper care according to the special needs of their children or children." ***Matter of Yeager***, 455 A.2d 717, 719 (Pa.Super. 1983). Further, "when determining whether a parent is providing a minor with proper care and control...the caretaker's acts and omissions should weigh equally." ***In re R.W.J.***, 826 A.2d at 14.

We agree that the record was undisputed that the Father, the Children's custodial parent, had left the children without proper parental care or control. The trial court found that:

> [i]t was undisputed that [Father] demonstrated his inability to provide proper parental care and control when he lost housing, the Children stopped attending school, and he effectively abandoned the Children in the care of family members. Likewise, it was undisputed that while Father had earlier rejected Agency services, he ultimately accepted the Agency's help in having the Children stay with Maternal Grandparents pursuant to a Voluntary Placement Agreement (VPA). He has effectively been absent since the Children went to live with Paternal Uncle and did not appear at the hearing to contest the adjudication or disposition.

T.C.O. at 10.

In addition, we also find that the record supports the trial court's finding that Mother, as the non-custodial parent, was not "immediately available" to provide proper parental care and control to the Children. At the time that the dependency petitions were filed, Mother had not had custody of the Children for approximately two years. Although Mother now claims that she could have provided parental care to the Children, she failed to step up to prioritize the Children when they needed her. The trial court found that:

> [it] was telling that Mother had not played a custodial role for approximately two years, and then, during a time when it

- 7 -

appeared that the children needed her the most – when Father was struggling and looking for someone to take care of them, Mother ignored the Agency's outreach because she was "upset." That was not something a parent who is "immediately available would do. That she reacted that way repeatedly over a period of a few weeks demonstrated a high level of volatility and a significantly limited ability to put her parenting role – and her Children – above her grievances.

T.C.O. at 10.

The trial court also found that Mother, like Father, lacked stable housing. While initially Mother claimed to be living at Children's Great-Grandmother's house, CYS discovered that at least, by October 15, 2024, Mother was not in fact living there.

Most significantly, the trial court credited the testimony of Maternal Grandmother who asserted her belief that Mother was not currently able to provide parental care to the Children, based on Maternal Grandmother's direct observations of Mother having drastic mood swings and intense outbursts along with Maternal Grandmother's perception that Mother would often seem to be "high" while visiting the Children at Maternal Grandmother's house.

Given the trial court's own observations of Mother's agitated behavior at the dependency hearing, the trial court found that Maternal Grandmother was "not exaggerating or attempting to inappropriately cut Mother off from the Children." T.C.O. at 15. The trial court characterized Maternal Grandmother's actions as "appropriately protective of the Children" as she has expressed a desire for the Children to be with Mother, but has imposed boundaries to require Mother to show she is in a position to provide the Children with parental care.

The trial court highlighted Maternal Grandmother's report that just two weeks prior to the hearing, Mother had been found unresponsive such that she required hospitalization. While Maternal Grandmother admitted that she was not provided information about the reason for Mother's need for emergency care due to privacy laws, the trial court found "the significance of this episode was buttressed by [Maternal Grandmother's] testimony that Mother acknowledged the need for treatment but has refused to follow through." T.C.O. at 14. The trial court noted that it is obvious that "a person is not immediately available to provide proper parental care and control when they are so unresponsive that they need to be hospitalized." T.C.O. at 14.

We acknowledge that Mother argues that CYS did not provide any direct evidence of her "current" substance abuse or give Mother an opportunity to show that the agency that her substance use was no longer a concern. We note that when CYS personnel shared concerns with Mother about her ability to provide the Children with parental care and offered her drug and alcohol treatment, Mother denied having any substance abuse problems and claimed she had no need for such services.

Although the trial court admitted that there was not sufficient direct evidence presented to determine exactly what had caused Mother's unexplained need for hospitalization and her erratic and volatile behavior, the trial court clarified that it nonetheless determined that Mother was unable to provide the Children with proper parental care and control. The trial court asserted that it would have been helpful to know whether Mother's inability to

provide parental care was a result of mental health problems, substance abuse, or some other cause, but ultimately found that such reasoning was not essential for the trial court to make a dependency determination.

As the trial court's findings of fact and credibility determinations are supported by the certified record, we find no abuse of discretion in the trial court's determination that the Children were without proper parental care or control necessary for their physical, mental, or emotional health, or morals and Mother was not immediately available to provide the Children with such parental care.

Mother also claims that the trial court erred in finding that CYS made "reasonable efforts to prevent or eliminate the need for removal of the Child[ren] from the home." Mother's Brief, at 10. Mother argues that CYS failed to provide services to Mother to prevent removal or assess what services that Mother might need.

Upon adjudicating a child dependent, a trial court may make an "appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state." *In re D.A.*, *A Minor*, 801 A.2d 614 (Pa.Super. 2002) (*en banc*) (citing 42 Pa.C.S.A. § 6351(a)).

> However, even after adjudicating a child dependent, a court may not separate that child from the parent unless it finds that the separation is clearly necessary. *Interest of N.S.*, 237 A.3d 546,

- 10 -

551 (Pa. Super. 2020) (citations omitted). Such necessity is implicated where the welfare of the child demands that they be taken from their parents' custody. *Id.* (citation omitted). "Clear necessity" is established when the court determines that alternatives are not feasible. *Id.* (citing *A.N. v. A.N.*, 39 A.3d 326 (Pa. Super. 2012)).

As part of its disposition analysis, the juvenile court must decide "whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home." 42 Pa.C.S.A. § 6351(b)(2). Neither federal nor Pennsylvania law defines reasonable efforts, but services for parents must directly promote the best interests of the child. *See Interest of K.M.*, 305 A.3d 116, 121 (Pa. Super. 2023) (citing *In Interest of C.K.*, 165 A.3d 935, 941-42 (Pa. Super. 2017)).

By requiring reasonable efforts, "the statute recognizes that there are practical limitations to such efforts." *Id.*

*Int. of M.G.*, ___A.3d ___, 2025 PA Super 17 (Jan. 24, 2025).

The trial court first found that it did not need to determine whether CYS made reasonable efforts to eliminate the need for Children to be removed from their home as Father signed a voluntary placement agreement.[6]  The trial

---

[6] Section 3130.65 of the Pennsylvania Department of Public Welfare Regulations sets forth the requirements of a voluntary placement agreement as follows:

**§ 3130.65. Voluntary placement agreement.**

(a) Custody of a child may be temporarily transferred to the county agency for no more than 30 days if the child's parents or other person legally responsible for the child freely enter into a written agreement with the county agency. The agreement may not be renewed beyond the 30 days and shall contain:

(1) A statement of the parents' or legal guardian's right to be represented by legal counsel or other spokesperson during conferences with the county agency about voluntary placement.

*(Footnote Continued Next Page)*

court cited **In re W.M.**, 41 A.3d 618 (Pa.Super. 2012) in which this Court held that "an agency is not required to obtain a judicial determination that it made reasonable efforts [] where the removal of a child is made pursuant to a valid voluntary placement agreement." **Id.** at 627.

We note that **In re W.M.** is not directly applicable as this decision discussed whether the Washington County CYS had complied with federal legislation that provides states with reimbursement for a percentage of foster care and adoption assistance payments when the state satisfies requirements set forth in the federal Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), which was amended by the Adoption and Safe Families Act of 1997 ("ASFA"). **See** 42 U.S.C.A. § 670 *et seq.* This Court noted in **In re W.M.** that while Section 672 of the ASFA requires an agency to demonstrate it made reasonable efforts to prevent the need to remove the child from the

_____

(2) A statement of the parent's or legal guardian's right to refuse to place the child.

(3) A statement of the parents' or legal guardian's right to visit the child, to obtain information about the child, and to be consulted about and approve medical and educational decisions concerning the child while the child is in voluntary placement.

(4) A statement of the parents' or legal guardian's right to the immediate return of the child upon request of the parent or guardian, unless the court orders the legal custody of the child to be transferred to the county agency.

(b) Placement of a child may not extend beyond 30 days unless a court order has been entered under 42 Pa.C.S. §§ 6341 and 6351 (relating to adjudication; and disposition of dependent child) which authorizes continued placement.

55 Pa.Code § 3130.65.

child's home when there is a judicial determination that the child's continued presence in the home would be contrary to his/her welfare, the statute does not include a similar requirement where the removal of the child has been made pursuant to a voluntary placement agreement. *In re W.M.*, 41 A.3d at 626-27.

However, regardless of whether CYS was required to obtain a judicial determination that it made reasonable efforts to prevent or eliminate the need for removal of the child from his home pursuant to 42 Pa.C.S.A. § 6351(b)(2), we agree with the trial court's determination that it had in fact made such reasonable efforts.

In this case, Father consented to the removal of the Children from their "home" in his care as he had lost suitable housing and asked for CYS's help to place the Children with Maternal Grandparents, who are approved foster parents. After the Children were placed with Maternal Grandparents, Father essentially abandoned his parental role.

The Children were not removed from Mother's home as she had not had any custody of the Children for the previous two years. In addition, Mother resisted CYS's efforts to involve her in its attempt to find the Children stable and appropriate housing. The trial court found that:

> [i]nitially, when the Agency received the referral in mid-September 2024, the Agency offered Mother services, but she declined. Later, during the crucial time period in mid-October 2024, when it became even more clear that Father, as the custodial parent, was no longer able to care for the Children, the Agency attempted to communicate with Mother further, but she was non-responsive and non-cooperative. Between October 8 and

- 13 -

October 20, 2024, Mother did not respond to repeated Agency outreach and attempts to meet in person. When Mother did ultimately respond, it was merely to leave a voicemail message saying that she was not responding to the Agency's outreach because she was upset. After receiving Mother's voicemail, the Agency reached out to Mother again, but Mother never returned the Agency's call.

T.C.O. at 10-12. While Mother eventually told CYS personnel that she would like to care for the Children at Maternal Great-Grandmother's home, CYS determined that during this period, Mother was no longer living there.

Given that Mother's uncooperativeness and unresponsiveness posed practical limitations to CYS's efforts to engage Mother to participate in the Children's care, we agree with the trial court's finding that CYS made reasonable efforts to prevent the need to remove the Children from their parents' care.

For the foregoing reasons, we discern no abuse of discretion in the trial court's decision to adjudicate the Children dependent, grant physical and legal custody to CYS, and place the Children in kinship foster care with Maternal Grandparents.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/8/2025

- 14 -